IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JANET L. VALLUZZI | : | |
| 2151 Jamieson Avenue | : | |
| No. 609 | : | |
| Alexandria, Virginia 22314 | : | |
| | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Civil Case No. |
| | : | |
| ALEX M. AZAR, II, SECRETARY | : | |
| U.S. DEPARTMENT OF HEALTH AND | : | |
| HUMAN SERVICES | : | |
| 200 Independence Avenue, S.W. | : | |
| Washington, D.C. 20201 | : | |
| | : | |
|     Defendant. | : | |
| | : | |
|     <u>Serve</u> | : | |
| | : | |
|     Robert K. Hur | : | |
|     United States Attorney for the | : | |
|     District of Maryland | : | |
|     6406 Ivy Lane | : | |
|     Greenbelt, Maryland 20770 | : | |

## **COMPLAINT**

Plaintiff Janet L. Valluzzi, by and through her counsel of record, hereby files her Complaint against Defendant Alex M. Azar, Secretary, U.S. Department of Health and Human Services, for employment discrimination on the basis of her disability (including association with a person with a disability and association with programs for persons with disabilities), age, and gender and for retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act and the Rehabilitation Act of 1973 and its amendments..

## PARTIES

1.      Plaintiff Janet L. Valluzzi ("Plaintiff") is an individual resident of the Commonwealth of Virginia.

2.      Defendant Alex M. Azar, II is the Secretary of the U.S. Department of Health and Human Services ("Defendant"), a federal Agency that maintains its headquarters at 200 Independence Avenue, S.W., Washington, D.C. 20201.

## JURISDICTION AND VENUE

3.      This action arises under the laws of the United States; specifically, Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et. seq.*, the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et. seq.* and the Rehabilitation Act of 1973 and its amendments , 29 U.S.C. § 701 *et. seq.*  This Court therefore has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1331.

4.      All of the events giving rise to the claims asserted in this lawsuit occurred in this judicial district at Defendant's facilities located at 5600 Fishers Lane in Rockville, Maryland; accordingly, venue is proper herein pursuant to 28 U.S.C. § 1391.

5.      This action follows an Initial Decision by the Merit Systems Protection Board dated October 25, 2018 and Plaintiff is authorized to have the facts at issue herein subject to trial *de novo* under 5 U.S.C. § 7703(b)(2) and (c)(3).

## FACTS

6.      Plaintiff Janet L. Valluzzi ("Plaintiff") is a sixty-three (63) year old female with 14.5 years of federal service.  Plaintiff's previous federal employment includes positions with the Department of Veterans Affairs, Library of Congress, and Department of Health and Human Services (Health Resources and Services Administration, Centers for Medicare and Medicaid

Services, Centers for Disease Control and Prevention and Agency for Healthcare Research and Quality Center for Financing, Access and Cost Trends).

7.     Plaintiff has a BS in Occupational Therapy from the University of Illinois Medical Center, a Master of Business Administration from Seattle University and a Doctor of Public Health from The George Washington University.

8.     Plaintiff commenced employment with Defendant on January 11, 2015 as a GS 14 Social Scientist.  Plaintiff was fifty-nine (59) years of age at the time she was hired.  Plaintiff's duty station was located at 5600 Fishers Lane in Rockville, Maryland.

9.     At the time Plaintiff was hired, the 5600 Fishers Lane building was undergoing extensive renovations, which later led to or exacerbated a health condition Plaintiff experienced while employed by Defendant that was subsequently diagnosed as Chronic Idiopathic Urticaria. Plaintiff's disability affected a number of major life activities, including the ability to work while suffering an outbreak of hives.

10.     As reflected on her SF 50, Plaintiff was initially classified as an exempt, non-bargaining unit employee -- i.e. she was not entitled to overtime compensation for work hours outside of her assigned tour of duty.

11.     The panel that interviewed and selected Plaintiff included George Zangaro, Ph.D. (former Director of National Center for Health Workforce Analysis ("NCWHA")), Michelle Washko, Ph.D. (former Deputy Director and currently acting Director, NCHWA) and Hayden Kepley, Ph.D. (former Branch Chief, Performance Metrics and Evaluations ("PME"), now Special Assistant to the Director).

12.     During their depositions taken in the MSPB proceeding, Dr. Zangaro (age 55), Dr. Washko (age 42) and Dr. Kepley (age 45) all agreed that Plaintiff was qualified for the position for which she had been selected.

13.     Plaintiff was assigned to the PME Branch under the direct supervision of Dr. Kepley.  At the time Plaintiff was hired, Dr. Washko was Plaintiff's second level supervisor and Dr. Zangaro served as Plaintiff's third level supervisor.

14.     Employees working in the PME Branch were assigned to perform either performance metrics work or program evaluations.  Because of her background and experience, Plaintiff was assigned to the evaluations side of the branch and one of her principal duties (as reflected on her Performance Management Appraisal Program ("PMAP")), was leading the development of two (2) program evaluation reports each year.  Because of the expansive nature of the undertaking, Plaintiff was given approximately six (6) months to complete each evaluation report (although the PMAP allowed the reports to be turned in simultaneously at the end of the year).

15.     At the time she was hired by Defendant, Plaintiff was a caregiver to her mother, who has a cognitive disability and lives with Plaintiff and her spouse.  Plaintiff's spouse is also disabled with multiple sclerosis, uses a scooter for mobility and is heavily reliant upon Plaintiff to assist him with his daily living activities.

16.     Dr. Kepley became aware of Plaintiff's status as a caregiver at the inception of her employment with Defendant.  Likewise, Dr. Zangaro learned that Plaintiff was a caregiver shortly after the commencement of Plaintiff's employment and shared the fact that he too was a caregiver to his mother.  Plaintiff's role as caregiver to her mother, an individual with a cognitive disability who constantly interrupts her activities, was also discussed during the April 4, 2016

mediation of Plaintiff's first EEO complaint during which Dr. Zangaro, Martine Palmiter (Chief, Labor and Employee Relations ("LER")) and Kelli Lee (Labor and Employee Relations Specialist, LER) were in attendance (Ms. Lee was not present the entire mediation).  Plaintiff's role as caregiver was also disclosed to other NCHWA staff members and Defendant's Reasonable Accommodation (RA) Team (Liz Pinkard-Adams and RA Lead, Katherine-Slye Griffith).

17.     In May/June 2015, Plaintiff began experiencing severe hives on her face and other parts of her body after spending time in the building which was undergoing asbestos removal and other construction. Dr. Zangaro offered to help refer Plaintiff to an allergist and advised her to place her name "on the list" maintained by the 5600 Fishers Lane Federal Occupational Health ("FOH") clinic of persons experiencing "sick building syndrome." The 5600 Fishers Lane building where Plaintiff's office was located was acknowledged to have sick building syndrome prior to construction.

18.     Upon completion of renovations of NCHWA's newly assigned office space with the 5600 Fishers Lane building, NCHWA employees were relocated to offices in the renovated section of the building.  Following her relocation, Plaintiff continued to experience severe hives (which were prominently visible) and she noticed white dust accumulating on her desk from the construction.

19.     As set forth above, Plaintiff was ultimately diagnosed with Chronic Idiopathic Urticaria, a condition that substantially limits a number of major life activities and her physicians suspected that her condition was caused or exacerbated by her work environment -- i.e. sick building syndrome. Plaintiff's personal physician's diagnosis was based on information obtained from FOH clinic during Plaintiff's first visit during which FOH acknowledged that there was a

'list' of individuals with sick building syndrome that were being monitored by FOH.  Plaintiff visited FOH a second visit in January 2016, and FOH Staff confirmed sick building syndrome and put Plaintiff "on the list."

20.     As set forth below, Plaintiff would later seek reasonable accommodation for her disability from Defendant during mediation of her first EEO complaint and later through Defendant's Reasonable Accommodation ("RA") process.     During the reasonable accommodation process, Plaintiff's health condition was evaluated by a physician employed by FOH who determined that Plaintiff had a physical condition that substantially limited one or more major life activities and therefore concluded Plaintiff would be considered an individual with a disability under the Americans with Disabilities Act Amendment Act ("ADAAA"), 42 U.S.C. § 12101, *et. seq*.

21.     Plaintiff's health condition was plainly visible to her colleagues and RA staff, as her hives and associated swelling of her face and eyes and hives on her hands were easily discernable. Plaintiff discussed her disability with her supervisor, Dr. Kepley and notified him of unanticipated sick leave when she experienced severe reactions and had to receive treatment at the urgent care clinic.  Plaintiff's disability was also discussed with management during the mediation of Plaintiff's first EEO complaint that took place on April 4, 2016 and with Defendant's RA Team on multiple occasions. Plaintiff also disclosed her health condition to Isaac Worede after he became PME Branch Chief in January 2017.

22.     During her first year of employment, Plaintiff was assigned and completed two (2) programmatic evaluations which, according to Dr. Kepley, were "quite good" and were completed in a timely manner.  As set forth in her 2015 PMAP, Plaintiff received a rating of 5

("Achieved Outstanding Results" – the highest possible rating) on the Evaluation element of her 2015 PMAP.

23.     According to Katherine Morasch, Ph.D. (who at the time was a peer but would later become PME Branch Chief and Plaintiff's direct supervisor), her interactions with Plaintiff during her first year were "pleasant" and Dr. Morasch "enjoyed getting to know her."  According to Dr. Morasch, who is thirty-eight (38) years of age, when she was Plaintiff's peer, Plaintiff maintained appropriate relationships with her colleagues -- "she was relatively quiet, but I think friendly."

24.     In October 2015, NCHWA held a retreat at which Plaintiff and her supervisors were in attendance.  At this retreat, Plaintiff was singled out and subjected to disparaging comments by her supervisors about her working relationship with a younger, non-disabled colleague, Jamie Doyle, PhD.

25.     Plaintiff also began to experience disparate treatment from her supervisors, who failed to timely provide her with evaluation assignments for 2016 while her similarly situated colleagues received their assignments in a timely manner.

26.     In November 2015, Plaintiff had a discussion with a PME Branch colleague, Dr. Doyle during which Dr. Doyle verbally harassed, bullied and discriminated against Plaintiff because of her inability to review a draft report prepared by Dr. Doyle while Plaintiff was out of town on approved leave engaged in caregiving activities for her mother.  Significantly, Dr. Doyle's review request to Plaintiff was not a work task assigned by Plaintiff's supervisor but was rather a personal request for a "favor."  The review would have involved issues that were supervisory in nature and were therefore outside the scope of Plaintiff's job duties.  As set forth

below, Plaintiff was unjustifiably disciplined for her role in this interaction while Dr. Doyle, who instigated the matter, was not.

27.     Instead of discipling Dr. Doyle as was appropriate, Dr. Kepley shifted the blame to Plaintiff, ordering her to "work it out" with Dr. Doyle with regard to reviewing the report and working with her generally -- or face "consequences."

28.     Dr. Doyle also harassed, bullied and discriminated against Plaintiff about PME Branch staff assignments, indicating she had met a Division of Medicine and Dentistry Branch Chief at an off-site location while teleworking to work on a program that Plaintiff had already been assigned by their mutual supervisor, Dr. Kepley.  Dr. Doyle, who is in her 30's, had been working on a program assigned to Plaintiff by their mutual supervisor without the supervisor's knowledge. For this behavior, Dr. Doyle was not disciplined but instead was rewarded by NCHWA management, who subsequently transferred Plaintiff's work to her.

29.     During his deposition taken during the MSPB proceedings, Dr. Kepley admitted that Dr. Doyle and her colleague, Nadra Tyus, liked to "antagonize" Plaintiff because they knew "it would stir stuff up."  In April 2016 during a NCHWA staff meeting, Dr. Doyle made ageist comments that were demeaning to older employees, including Plaintiff.  Dr. Doyle was not disciplined by management regarding her discriminatory comments.

30.     During his deposition taken during the MSPB proceedings, Dr. Zangaro testified that he spoke with Division of Medicine and Dentistry Director, Candace Chen, who allegedly asked that Plaintiff not be assigned projects with her division because she preferred Dr. Doyle, a significantly younger and non-disabled employee.  According to Dr. Zangaro, Dr. Chen (age unknown, but non-disabled), stated that Plaintiff was difficult to work with -- which Dr. Zangaro

inexplicably did not question despite the fact that Plaintiff received accolades for the two (2) evaluations she had performed for Dr. Chen's division in 2015.

31.     Following the interaction between Dr. Doyle and Plaintiff for which Plaintiff was later unjustifiably disciplined, Dr. Kepley consulted with Ms. Lee in LER and, with her assistance, began preparing a non-disciplinary Memorandum of Counseling for Plaintiff based on certain email communications with Plaintiff that he considered "disrespectful."  The emails were not, in fact, even remotely disrespectful.

32.     During his deposition, Dr. Kepley testified that he began drafting the Memorandum of Counseling because of the emails described above and not because of Plaintiff's interaction with Dr. Doyle.   Ultimately, Dr. Kepley elected not to pursue the Memorandum of Counseling and subsequently left his position as PME Branch Chief and accepted a non-supervisory position as Dr. Zangaro's special assistant in or about mid-December 2015.   According to a document prepared by Ms. Lee, Plaintiff's first line supervisor (Dr. Kepley) and second line supervisor (Dr. Washko) felt that Plaintiff's conduct had improved sufficiently and that the Memorandum of Counseling was unnecessary.

33.     During this same general timeframe, Dr. Morasch hosted a NCHWA-sponsored Christmas potluck dinner at her home to which all NCHWA employees and their significant others were invited.  Because Dr. Morasch failed to make her home accessible to persons with disabilities, Plaintiff, her mother and her spouse were prevented from attending this Defendant-sponsored event.

34.     Following Dr. Kepley's promotion, Dr. Washko became Acting PME Branch Chief (and Plaintiff's direct supervisor) in addition to her job as Deputy Director.   Soon after becoming Acting Branch Chief, Dr. Washko, with Ms. Lee's assistance, drafted and provided

Plaintiff with the Memorandum of Counseling ("MOC") despite her recent admission that Plaintiff's conduct had "improved."  The MOC concerned Plaintiff's earlier interaction with Dr. Doyle (an issue that Dr. Kepley excluded in his earlier draft), her emails with Dr. Kepley described above and an additional email exchange with Dr. Washko that she considered inappropriate (but in fact was not).

35.     The MOC was delivered to Plaintiff on December 23, 2015, was non-disciplinary in nature and, as described below, was subsequently removed from Defendant's files in accordance with Plaintiff's grievance and the settlement of Plaintiff's first EEO complaint in April 2016.

36.     Plaintiff met with Dr. Washko on January 20, 2016 to discuss the Memorandum of Counseling and to notify Dr. Washko of her intent to file a grievance contesting the same. During this meeting, Dr. Washko grew visibly angry, challenged Plaintiff's right to grieve the Memorandum of Counseling, raised her voice and engaged in physically threatening behavior towards Plaintiff.  As required by Defendant's policy, Plaintiff later reported this interaction as an incident involving workplace violence to Dr. Zangaro, LER and the Office of Civil Rights, Diversity and Inclusion ("OCRDI"), none of whom adequately investigated the complaint as mandated by Defendant's policy.  No steps were taken to protect Plaintiff or ensure her safety and she was required to continue to interact with Dr. Washko.

37.     Plaintiff provided Dr. Washko with a memorandum on January 27, 2016 grieving the MOC. Defendant's grievance process for review of proposed disciplinary actions only involves review by the applicable chain of command – i.e. it allows management to exonerate themselves.   Plaintiff's memorandum contains multiple allegations of discrimination on the basis of age and by reason of her association with a person with a disability.  Dr. Washko, who

was the level 1 deciding official, denied the relief requested in Plaintiff's grievance.   Dr. Zangaro, who was the level 2 deciding official, partially granted the relief requested by Plaintiff, and agreed to remove the MOC from Defendant's files after six (6) months (June 23, 2016).

38.    In February 2016, Dr. Morasch, a substantially younger and non-disabled employee, was selected as PME's Branch Chief -- a position for which Plaintiff was qualified, had applied for, but was non-selected.

39.    On February 2, 2016, shortly after Plaintiff's interaction with Dr. Washko involving workplace violence, Plaintiff received her final 2015 PMAP (signed by Dr. Washko the following day) that contained an overall rating of "Achieved Expected Results," but contained a rating of 2 (Partially Achieved Expected Results) on the Customer Service/Teamwork element based on a number of false allegations by management, including accusing Plaintiff of not being a good team member when she failed to provide a favor to Dr. Doyle to review her draft evaluation report while Plaintiff was on approved leave to provide caregiving to her mother.   No other employees within NCHWA received a 2 or lower rating on any element set forth in their 2015 PMAP.

40.    Plaintiff subsequently grieved the substandard rating on her 2015 PMAP and Dr. Zangaro, the deciding official at stage 2 of the grievance process, agreed to raise the Customer Service/Teamwork element to a rating of 3 ("Achieved Expected Results").   According to Dr. Zangaro, he found the rating to be borderline and determined that there was evidence that Plaintiff "was working collaboratively with [her] peers and other colleagues outside the division in a collegial manner" and he therefore raised her Customer Service/Teamwork rating accordingly.

41.     After first engaging in protected activity in her January 27, 2016 memorandum to Dr. Washko, Plaintiff filed her first former EEO complaint in February 2016 and second complaint in December 2016, collectively alleging discrimination on the basis of her age, gender, disability, association with person(s) with disabilities and/or programs for persons with disabilities.  Dr. Washko testified that she was aware Plaintiff had filed two (2) EEO complaints and submitted affidavits during the course of both complaints.  Likewise, Dr. Zangaro testified that he was aware of both of Plaintiff's EEO complaints that caused him to be "more cautious" in his interactions with Plaintiff.  According to Dr. Zangaro, he felt he was taking a "huge risk" interacting with Plaintiff because he feared any such interaction would turn into an EEO complaint.

42.     On April 4, 2016, Defendant and Plaintiff engaged in a mediation of Plaintiff's first EEO complaint.  Ms. Lee denied Plaintiff's request for union representation at the mediation on grounds that Plaintiff was a non-bargaining unit employee (as reflected on her SF 50).

43.     At the mediation, the parties agreed to settle Plaintiff's first EEO complaint, which, among other things, required Defendant to provide Plaintiff with her assignments in a timely manner, to look into "hoteling" arrangements (i.e. office space outside of 5600 Fishers Lane) to accommodate her disability, support an abstract prepared by Plaintiff and support Plaintiff's "career development endeavors."  According to Dr. Morasch, she was not made aware of the terms of the Settlement Agreement and therefore was not even in a position to honor its terms while serving as Plaintiff's direct supervisor.  Likewise, Dr. Washko professed to have no knowledge of the terms of the Settlement Agreement until "many, many, many" months after it was signed.  Dr. Zangaro promised Plaintiff he would ensure that the terms of the Settlement Agreement would be honored but failed to do so.  When Plaintiff later filed her breach of

settlement action, Dr. Zangaro misrepresented that the onus was on Plaintiff to seek the items Defendant had promised to provide in the Settlement Agreement.

44.     The terms of the Settlement Agreement include the option of allowing Plaintiff to telework on a full-time basis.  This term was included in the Settlement Agreement over the objections of Plaintiff, who was not eligible to telework under OPM and Defendant's guidelines because of her caregiver status to her cognitively impaired mother, who constantly interrupted Plaintiff's activities, and her spouse.  Despite her inability to telework, Plaintiff ultimately agreed to include the telework provision in the agreement because it was possible her caregiving situation might change in the future given her mother's advanced age.  Plaintiff's inability to telework became a constant source of friction with management, who clearly wanted Plaintiff out of the office.  This was a contributing factor with regard to some or all of the issues and incidents described herein and ultimately led or contributed to Plaintiff's termination in August 2017.

45.     Defendant subsequently breached the terms of the Settlement Agreement by, among other things, failing to make a reasonable effort to secure hoteling for Plaintiff and failing to support Plaintiff's career development endeavors (including failure to approve requested training and other career enhancing endeavors, including publication of an oral health report and the Teaching Health Center Graduate Medical Education ("THCGME") contract publication). As a result of Defendant's breach, Plaintiff filed two (2) breach actions, one of which resulted in a skewed finding in favor of Defendant despite its failure to provide evidence that the Settlement Agreement was not breached.  The second breach action was never addressed by Defendant.

46.     On April 15, 2016, after Plaintiff filed her EEO complaint and shortly after the mediation of the EEO complaint, Plaintiff was confronted by Dr. Zangaro for being present in the office on a day that she was scheduled for AWS (Alternative Work Schedule).  At the time,

Plaintiff was classified as an exempt, non-bargaining unit employee on her SF 50, was not eligible for overtime compensation under the FLSA and presumably was permitted to work outside her scheduled tour of duty as other exempt, non-bargaining unit employees were (including Dr. Zangaro, Dr. Washko and Dr. Morasch), Dr. Zangaro was furious that Plaintiff was at work, acted in a threatening manner and put Plaintiff in fear of her personal safety. Plaintiff reported this interaction as workplace violence and again, the incident was not adequately investigated as mandated by Defendant's policy.

47.     On May 3, 2016, despite her status as a non-bargaining unit employee, Plaintiff received a Letter of Reprimand ("LOR") from Dr. Morasch for working outside of her tour of duty on her AWS day.

48.     In addition, the LOR (which was prepared jointly by Dr. Morasch and Ms. Lee) contained other allegations concerning Plaintiff's role as a Contracting Officer Representative ("COR") for THCGME contract with George Washington University -- namely for alleged inappropriate conduct during a meeting and for a communication she had with the contract specialist on the contract.  All of the information used by Dr. Morasch to support the reprimand came from Dr. Zangaro.  Significantly, the evidence file used to support the Letter of Reprimand contains no evidence to support the allegations concerning alleged inappropriate conduct at the meeting, as alleged in the LOR.   Further, with regard to her communications with the contract specialist, Plaintiff acted in accordance with chain of command authorized under Appropriations Law and was disciplined for doing so.  Moreover, management's actions put Plaintiff, as COR for the contract, at risk financially for deliverables not covered under the contract.

49.     At the direction of Dr. Zangaro, Dr. Morasch also removed Plaintiff as the COR of the THCGME contract as part of the reprimand.   Plaintiff's conduct did not warrant a

reprimand; indeed, during her deposition in the MSPB proceeding, Dr. Morasch admitted that removing Plaintiff as the COR was not justified.  Dr. Morasch, who was unaware that Plaintiff was classified as an exempt, non-bargaining unit employee at the time of the AWS incident, also admitted that this information may have influenced her decision whether or not to discipline Plaintiff for working outside of her tour of duty.

50.     Given these facts, the timing of her protected activity vis-à-vis the issuance of discipline and appearance of retaliation, Plaintiff grieved the LOR.  Dr. Washko, who was the level 1 deciding official, denied Plaintiff's grievance.    Likewise, Dr. Zangaro, the level 2 deciding official, denied Plaintiff's grievance.  Significantly, Plaintiff, who had been reclassified as a bargaining unit employee at this point, was also denied the benefit of union representation at the meeting during which her supervisors issued her the Letter of Reprimand.

51.     After Dr. Morasch moved into her supervisory role, as she had with Dr. Kepley, Plaintiff also attempted to engage Dr. Morasch in a discussion regarding her disability as it impacted her ability to be at work and could potentially require an emergency response.  This discussion was an effort to initiate the interactive process to formulate a reasonable accommodation of Plaintiff's disability, which was affecting many of Plaintiff's major life functions, including the ability to work at 5600 Fishers Lane building due to allergic reactions that occurred when she was present inside the building.  Dr. Morasch informed Plaintiff that she was only permitted to discuss certain work-related activities during their meetings and refused to engage in a discussion concerning Plaintiff's medical issues thereby thwarting the interactive process, as well as adversely impacting the safety and health of the Plaintiff.

52.     Dr. Morasch stepped down as PME Branch Chief in June 2016, after only four (4) months in the position and assumed her former position as a GS 13 non-supervisory social

scientist.  Dr. Washko again became acting PME Branch Chief (in addition to her role as Deputy Director) and Plaintiff's direct supervisor and held this position until January 2017.

53.     In August 2016, months after assuming the acting PME Branch Chief role, Dr. Washko abruptly revoked Plaintiff's right to utilize AWS.

54.     During a PME Branch meeting held in August 2016, Dr. Morasch mocked Plaintiff after she attempted to obtain clarification about Dr. Zangaro's announcement at an earlier meeting concerning disclosing health conditions to supervisors.  Subsequently, Dr. Washko rebuked Plaintiff for asking for clarification of Dr. Zangaro's announcement.

55.     Following instructions provided by Dr. Zangaro at the April 2016 mediation, on August 23, 2016, Plaintiff contacted Defendant's RA team via email (copying Dr. Zangaro and Dr. Washko), relaying her concerns regarding her interaction with Dr. Morasch about her health condition and retaliation by her supervisors.  Plaintiff was disciplined by Dr. Washko for contacting the RA team, despite the fact that Plaintiff was following Dr. Zangaro's directions.

56.     On the same day Plaintiff contacted Defendant's RA Team, Dr. Washko, with Ms. Lee's assistance, issued Plaintiff a proposed five (5) day suspension based upon alleged inappropriate email communications, sending work-related email outside of her tour of duty (i.e. mere minutes after her tour of duty ended) and for allegedly failing to follow instructions. Except for the three (3) emails sent shortly after Plaintiff's tour of duty ended (something other similarly situated employees routinely did without being disciplined), these allegations were without merit and did not warrant any form of discipline.

57.     Plaintiff grieved the proposed five (5) day suspension, but proposed suspension was upheld by Dr. Zangaro, with Ms. Lee's assistance, on October 6, 2016. Plaintiff served her

unpaid suspension from October 17, 2016 through October 21, 2016.  Plaintiff was not permitted to work during her suspension.

58.     Despite her suspension, Plaintiff's supervisors refused to provide Plaintiff with appropriate extensions to submit draft evaluations and disciplined her for requesting such extensions

59.     Subsequently, in late 2016, Plaintiff initiated the process of obtaining a reasonable accommodation of her disability through Defendant's RA Team.  As an accommodation, Plaintiff again requested hoteling or some other option to relocate her office outside of the 5600 Fishers Lane building -- an accommodation that would serve to alleviate the allergic reactions she was experiencing while working in the building.  Defendant's RA Team refused to provide Plaintiff with information from FOH concerning its conclusions regarding reasonable accommodation options, effectively thwarting the required interactive process.

60.     Defendant declined to provide hoteling or another option that would allow Plaintiff to work outside the 5600 Fishers Lane building, but instead offered to provide Plaintiff with alternative work space *within* the 5600 Fishers Lane building – which was plainly an ineffective accommodation as it would require Plaintiff to remain in the building and continue to be exposed to the contaminants that caused her allergic reactions due to the fact that the alternative work space within the 5600 Fishers Lane building had the same ventilation system as the rest of the building.  Ultimately, Mr. Worede, who became Plaintiff's supervisor in January 2017, agreed to provide Plaintiff with an accommodation in the form of air purifier for her office and a change with regard to her fixed work schedule hours, which did little to alleviate the symptoms Plaintiff was experiencing from working inside the 5600 Fishers Lane building.

61.     On November 29, 2016, Dr. Washko, with Ms. Lee's assistance, issued Plaintiff a proposed ten (10) day suspension based upon alleged inappropriate email communications, failure to follow instructions and lack of candor.  All of these allegations were without merit and did not warrant any form of discipline.

62.     Plaintiff grieved the proposed ten (10) day suspension, but the proposed suspension was upheld by Dr. Zangaro, with Ms. Lee's assistance, on February 2, 2017. Plaintiff served her unpaid suspension from February 6, 2017 through February 15, 2017.  Plaintiff was not permitted to work during her suspension.

63.     In January 2017, Dr. Washko falsely accused Plaintiff of being AWOL when, in fact, Plaintiff's absence was due to illness and was approved as sick leave.

64.     As set forth above, in January 2017, Mr. Worede was selected as PME Branch Chief and became Plaintiff's direct supervisor.  According to Dr. Zangaro, who was not in favor of hiring Mr. Worede for this position, Mr. Worede had a management background, was not a scientist, lacked a statistical background and had no experience with evaluations when he was hired as PME Branch Chief.  During his deposition, Dr. Zangaro admitted that Mr. Worede did not have a "firm grasp" on the content of evaluation reports and essentially served as a conduit to Dr. Zangaro and Dr. Washko, who were forced to review Plaintiff's evaluation reports because of Mr. Worede's lack of knowledge and experience.

65.     In January 2017, Plaintiff received her final 2016 PMAP which contained an unwarranted substandard rating on one critical performance element.  Due to this unwarranted rating, Plaintiff was also denied a WIGI for 2017.

66.     Plaintiff's assignments in 2016 included the Behavioral Health evaluation (BHE), a draft of which she timely completed and submitted in December.  Significantly, Plaintiff's

2016 final PMAP reflects a rating of 3 on her evaluation element, signifying that Plaintiff successfully completed the evaluations that were assigned to her in 2016, to include her BHE.

67.     Notwithstanding the PMAP rating issued after the completion of the draft BHE report, Mr. Worede, at the behest of Dr. Washko and a non-supervisory employee, continued to scrutinize the report in 2017.  Contrary to the authorship policy that provided Plaintiff with broad discretion regarding the content of the BHE, Mr. Worede demanded Plaintiff make  certain edits to the report.  Plaintiff's supervisors even provided her with a due date for a draft BHE report on a date that fell during her ten (10) suspension when she was not permitted to work.

68.     Plaintiff voiced concerns about the suggested edits, including those omitting HRSA's programs and NCHWA evaluation report findings regarding individuals with disabilities, including individuals with behavioral health conditions and individuals with functional limitations.  Plaintiff was concerned that consistent with BHW mission to train highly skilled workforce, omitting such information, including information regarding health workforce training programs addressing mental health parity laws, violated the law with regard to persons with disabilities and/or mental health conditions.  Plaintiff's concerns were met with hostility by management who called for removal of these findings and unjustifiably deemed Plaintiff's BHE report "unusable" and, as set forth in her Notice of Proposed Removal sustained by Dr. Zangaro, a basis for her termination despite the fact that Plaintiff's work on the BHE report was deemed acceptable in her 2016 PMAP.

69.     On February 21, 2017, two (2) months after the date the Plaintiff's first 2017 evaluation report was to have been made pursuant to the Settlement Agreement,  Mr. Worede provided Plaintiff with an assignment to complete an evaluation of the Nurse Faculty Loan Program (NFLP) program and imposed a May 1, 2017 hard deadline, a nearly impossible

undertaking given the six (6) month timeframe typically allotted to complete such evaluations, and Plaintiff's other work commitments. Mr. Worede promised that he would provide Plaintiff with the data she needed for the NFLP evaluation, but ultimately failed to do so.

70. In addition to the incidents described above, following her EEO activity in early 2016 and thereafter, Plaintiff was subjected to a host of discriminatory acts, retaliation, incidents of workplace violence, bullying and disparate treatment from her supervisors that had the effect of creating a hostile work environment. Specifically:

a) Plaintiff was subjected to condescending and ageist comments by her supervisors;

b) Management failed to provide timely assignments and failed to provide reasonable instructions and timely edits to Plaintiff's 2016 draft evaluation reports and/or imposed requirements (i.e. reformatting) that caused delays and effectively reduced the time in which Plaintiff had to complete her work;

c) Plaintiff was denied a detail to Department of State, which would have been an effective accommodation as it would have required her to be out of the 5600 Fishers Lane building for an extended period of time;

d) Plaintiff was denied a transfer to HRSA's HIV/AIDS Bureau (HAB) for whom she had performed well-received work for and which also would have served as an effective accommodation as she would have been out of the 5600 Fishers Lane building for periods of time;

e) Plaintiff was denied training and later disciplined for asking for training;

f) Plaintiff was denied access to functioning work computer and network files necessary to perform work assignments;

g) Plaintiff was not provided equal access to information about data collection (i.e. Office of Management and Budget (OMB) Submission/Approval documentation) necessary to perform work assignments;

h) Although approved by Dr. Zangaro, Plaintiff was denied access to software necessary to perform work assignments (e.g. ArcGIS, SAS-Callable SUDAAN);

i) Plaintiff was provided with assignments that could not be completed due to lack of collection of data (i.e. Academic Units for Primary Care

Training and Enhancement (AU-PCTE));

j)  Management imposed unreasonable deadlines to complete work assignments;

k)  Plaintiff was subjected to unequal treatment with regard to the assignment of high visibility projects;

l)  Plaintiff was regularly harassed by management regarding deadlines and substantive work products;

m)  Management failed to support Plaintiff's request to develop an individual development plan ("IDP") for training and program participation as required by the Settlement Agreement;

n)  Plaintiff received unjustified poor ratings from Dr. Washko on her 2016 mid-year PMAP, even after that score had been raised in the April 2016 mediation.  Plaintiff also received unjustified poor ratings on her 2016 final PMAP which Dr. Washko refused to discuss with her.  ;

o)  Plaintiff was subjected to further incidents of workplace violence by Mr. Worede who threw a draft evaluation report at Plaintiff while she was seated at her desk;

p)  Plaintiff was subjected to condescending and patronizing comments by her supervisors regarding her knowledge of basic computer skills and statistical analysis;

q)  Plaintiff's time and attendance was subjected to unreasonably close scrutiny;

r)  Plaintiff was repeatedly pressured to telework despite her ineligibility due to status as caregiver to person with a disability;

s)  Plaintiff was falsely accused of refusing reasonable accommodations proposed by Defendant;

t)  Plaintiff was prevented from exercising the rights and privileges of employment with Defendant, including utilizing leave to address medical and dental needs;

u)  Plaintiff was prevented from taking leave to address mother's financial and medical needs due to unreasonable, multiple hard deadlines;

v)  Plaintiff was constrained with regard to her use of official time to review and prepare materials associated with her EEO complaints because Defendant did not have required EEO policy regarding use of official time;

w)    Plaintiff was denied the right to donate leave to another employee who was also a caregiver;

x)    Management failed to include Plaintiff on the 2017 Confidential Financial Disclosure Report (OGE 450) list, thereby placing Plaintiff in jeopardy of ethical violations;

y)    OCRDI stopped accepting Plaintiff's EEO complaint information in October 2016 thwarting the intake process and denying Plaintiff due process; and

z)    Management placed Plaintiff in financial jeopardy by requesting deliverables not in contract for which Plaintiff was COR.

71.    In May 2017, even before Plaintiff's BHE and NFLP evaluation reports were due, Mr. Worede began working with Ms. Lee to effectuate Plaintiff's removal.

72.    On or about May 10, 2017, Ms. Lee delivered a draft Notice of Proposed Removal to Mr. Worede with a number of charges and specifications used to support the proposed removal, many of which substantially predated the draft Notice of Proposed Removal and involved alleged incidents for which Plaintiff was not previously counseled or disciplined. The draft Notice of Proposed Removal substantially evolved over the course of more than two (2) months, and at least three (3) specifications that were included within the initial draft Notice of Proposed Removal were subsequently omitted and others that did not appear in the initial draft were added.  Significantly, many of the newly added specifications concerned events that predated the initial draft Notice of Proposed Removal yet were not included in the first draft.

73.    On July 11, 2017, Mr. Worede issued Plaintiff a Notice of Proposed Removal containing a number of charges and specifications littered with inaccuracies and false allegations.  For example, in Charge 1, Specification 1, Plaintiff was accused of failing to meet a Saturday February 11, 2017 deadline to submit her revised BHE report.  Plaintiff was serving her ten (10) day suspension on February 11, 2017 and it was therefore impossible for her to deliver her report on the assigned deadline -- a fact subsequently admitted by management during

discovery.  After Mr. Worede delivered the Notice of Proposed Removal, Plaintiff was escorted out of the building by LER and security, who taunted Plaintiff in her office while she was collecting her belongings and while she was being escorted out of the building.

74.     Plaintiff presented an oral and written response to the Notice of Proposed Removal, rebutting all allegations and establishing that she had been subjected to discrimination and retaliation.

75.     On August 17, 2017, Dr. Zangaro issued his decision on Plaintiff's Notice of Proposed Removal, sustaining the removal and ending Plaintiff's career of federal service.

76.     When making arrangements to pick up her personal belongings from her office, Plaintiff and her disabled spouse were directed to pick up these items at the building's loading dock, which was demeaning and constitutes further evidence of disability and associational discrimination.

77.     Following Plaintiff's removal, Defendant balked at reinstating Plaintiff's medical/dental benefits which had been cancelled and to which she was entitled by virtue of her years of federal service.

78.     All conditions precedent to filing suit have been satisfied.

## COUNT I

## DISCRIMINATION – TITLE VII VIOLATIONS

79.     Paragraphs 1 through 78 above are hereby adopted and incorporated herein by reference.

80.     At all times relevant herein, Plaintiff was an employee of Defendant as that term defined by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq*. ("Title VII").

81.     Defendant is an employer as defined by Title VII.

82.     Title VII prohibits employment discrimination on the basis of race, color, national origin and sex.

83.     Defendant's actions as described above, constitute willful, intentional and unlawful employment discrimination against Plaintiff on the basis of her sex in violation of Title VII.

84.     As a result of Defendant's willful, intentional, and unlawful discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, severe mental and emotional distress, and other pecuniary and non-pecuniary damages.

85.     All conditions precedent to Plaintiff's right of recovery have been fully satisfied.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

a.      That judgment be entered in favor of Plaintiff and against Defendant for damages for back pay, loss of benefits and all other pecuniary damages in the amount of $300,000 or such other amount as may be established at trial;

b.      That the Court order Plaintiff's reinstatement or, in the alternative, front pay;

c.      That judgment be entered in favor of Plaintiff and against Defendant for compensatory damages in the amount of $300,000;

d.      That Plaintiff be awarded reasonable attorney's fees and all costs and expenses incurred by Plaintiff in bringing this action;

e.      Pre and post judgment interest at the highest rate permitted by law; and

f.      Such other and further relief as the Court deems just and proper.

## COUNT II

### HOSTILE WORK ENVIRONMENT – TITLE VII VIOLATION

86.     Paragraphs 1 through 85 above are hereby adopted and incorporated herein by reference.

87.     Defendant's discriminatory actions as described above were unwelcome, based upon Plaintiff's sex and were sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive work environment.

88.     As a result of Defendant's willful, intentional and unlawful discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, severe mental and emotional distress, and other pecuniary and non-pecuniary damages.

89.     All conditions precedent to Plaintiff's right of recovery have been fully satisfied.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

a.     That judgment be entered in favor of Plaintiff and against Defendant for damages for back pay, loss of benefits and all other pecuniary damages in the amount of $300,000 or such other amount as may be established at trial;

b.     That the Court order Plaintiff's reinstatement or, in the alternative, front pay;

c.     That judgment be entered in favor of Plaintiff and against Defendant for compensatory damages in the amount of $300,000;

d.     That Plaintiff be awarded reasonable attorney's fees and all costs and expenses incurred by Plaintiff in bringing this action;

e.     Pre and post judgment interest at the highest rate permitted by law; and

f.     Such other and further relief as the Court deems just and proper.

## COUNT III

## RETALIATION – TITLE VII VIOLATION

90.     Paragraphs 1 through 89 above are hereby adopted and incorporated herein by reference.

91.     By complaining about being discriminated against by her supervisors on account of her sex, Plaintiff engaged in statutorily protected activity.

92.     Plaintiff was subjected to adverse employment action following her protected activity, including, without limitation, being subjected to unwarranted disciplinary action and removed from federal service.

93.     A causal connection exists between Plaintiff's protected activity and the adverse action to which she was subjected.

94.     Defendant's actions constitute willful, intentional and unlawful retaliation against Plaintiff as a result of statutorily protected activity in violation of Title VII.

95.     As a result of Defendants' willful, intentional and unlawful conduct, Plaintiff has suffered and will continue to suffer lost wages, severe mental and emotional distress, and other pecuniary and non-pecuniary damages.

96.     All conditions precedent to Plaintiff's right of recovery have been fully satisfied.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

a.     That judgment be entered in favor of Plaintiff and against Defendant for damages for back pay, loss of benefits and all other pecuniary damages in the amount of $300,000 or such other amount as may be established at trial;

b.     That the Court order Plaintiff's reinstatement or, in the alternative, front pay;

c.      That judgment be entered in favor of Plaintiff and against Defendant for compensatory damages in the amount of $300,000;

d.      That Plaintiff be awarded reasonable attorney's fees and all costs and expenses incurred by Plaintiff in bringing this action;

e.      Pre and post judgment interest at the highest rate permitted by law; and

f.      Such other and further relief as the Court deems just and proper.

## COUNT IV

## DISCRIMINATION – AGE DISCRIMINATION IN EMPLOYMENT ACT VIOLATION

97.      Paragraphs 1 through 96 above are hereby adopted and incorporated herein by reference.

98.      At all times relevant hereto, Plaintiff was within the class of persons protected by the provisions of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.*

99.      Pursuant to 29 U.S.C. § 633a, Defendant is covered by the provisions of the ADEA prohibiting employment discrimination based upon age.

100.      Defendant's actions, as described herein, have resulted in adverse employment action against Plaintiff because of her age, including, without limitation, unwarranted disciplinary actions and termination.

101.      Defendant's actions as described herein were undertaken in willful violation of the provisions of the ADEA.

102.      Plaintiff has suffered pecuniary damages as a direct and proximate result of Defendant's actions.

103.    Plaintiff has complied with all prerequisites and other conditions precedent prior to instituting this lawsuit.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

a.      That judgment be entered in favor of Plaintiff and against Defendant for damages for back pay, loss of benefits and all other pecuniary damages in the amount of $300,000 or such other amount as may be established at trial;

b.      That the Court order Plaintiff's reinstatement or, in the alternative, front pay;

c.      That Plaintiff be awarded reasonable attorney's fees and all costs and expenses incurred by Plaintiff in bringing this action;

d.      Pre and post judgment interest at the highest rate permitted by law; and

e.      Such other and further relief as the Court deems just and proper.

## COUNT V

## RETALIATION – ADEA VIOLATION

104.    Paragraphs 1 through 103 above are hereby adopted and incorporated herein by reference.

105.    By complaining about being discriminated against by her supervisors on account of her age, Plaintiff engaged in statutorily protected activity.

106.    Plaintiff was subjected to adverse employment action following her protected activity, including, without limitation, being subjected to unwarranted disciplinary action and removed from federal service.

107.    A causal connection exists between Plaintiff's protected activity and the adverse action to which she was subjected.

108.    Defendant's actions constitute willful, intentional and unlawful retaliation against Plaintiff as a result of statutorily protected activity in violation of the ADEA.

109.    As a result of Defendants' willful, intentional and unlawful conduct, Plaintiff has suffered and will continue to suffer lost wages, severe mental and emotional distress, and other pecuniary and non-pecuniary damages.

110.    All conditions precedent to Plaintiff's right of recovery have been fully satisfied.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

a.    That judgment be entered in favor of Plaintiff and against Defendant for damages for back pay, loss of benefits and all other pecuniary damages in the amount of $300,000 or such other amount as may be established at trial;

b.    That the Court order Plaintiff's reinstatement or, in the alternative, front pay;

c.    That Plaintiff be awarded reasonable attorney's fees and all costs and expenses incurred by Plaintiff in bringing this action;

d.    Pre and post judgment interest at the highest rate permitted by law; and

e.    Such other and further relief as the Court deems just and proper.

## COUNT VI

## DISCRIMINATION – REHABILITATION ACT VIOLATIONS

111.    Paragraphs 1 through 110 above are hereby adopted and incorporated herein by reference.

112.    At all times relevant herein, Plaintiff was an individual with a disability as that term defined by Rehabilitation Act of 1973, 29 U.S.C. § 701, *et. seq*.

113.    Defendant's actions as described above, including, without limitation, its failure to reasonably accommodate Plaintiff's disability and discriminating against Plaintiff because of

her disability, association with a person with a disability and/or association with programs for persons with disabilities, constitute willful, intentional and unlawful employment discrimination against Plaintiff in violation of the Rehabilitation Act.

114.    As a result of Defendant's willful, intentional and unlawful discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, severe mental and emotional distress, and other pecuniary and non-pecuniary damages.

115.    All conditions precedent to Plaintiff's right of recovery have been fully satisfied.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

a.      That judgment be entered in favor of Plaintiff and against Defendant for damages for back pay, loss of benefits and all other pecuniary damages in the amount of $300,000 or such other amount as may be established at trial;

b.      That the Court order Plaintiff's reinstatement or, in the alternative, front pay;

c.      That judgment be entered in favor of Plaintiff and against Defendant for compensatory damages in the amount of $300,000;

d.      That Plaintiff be awarded reasonable attorney's fees and all costs and expenses incurred by Plaintiff in bringing this action;

e.      Pre and post judgment interest at the highest rate permitted by law; and

f.      Such other and further relief as the Court deems just and proper.

## COUNT VII

## RETALIATION – REHABILITATION ACT VIOLATION

116.    Paragraphs 1 through 115 above are hereby adopted and incorporated herein by reference.

117.     By complaining about being discriminated against by her supervisors on account of her disability, association with a person with a disability and/or association with programs for persons with disabilities, Plaintiff engaged in statutorily protected activity.

118.     Plaintiff was subjected to adverse employment action following her protected activity, including, without limitation, being subjected to unwarranted disciplinary action and removed from federal service.

119.     A causal connection exists between Plaintiff's protected activity and the adverse action to which she was subjected.

120.     Defendant's actions constitute willful, intentional and unlawful retaliation against Plaintiff as a result of statutorily protected activity in violation of the Rehabilitation Act.

121.     As a result of Defendants' willful, intentional and unlawful conduct, Plaintiff has suffered and will continue to suffer lost wages, severe mental and emotional distress, and other pecuniary and non-pecuniary damages.

122.     All conditions precedent to Plaintiff's right of recovery have been fully satisfied.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

a.     That judgment be entered in favor of Plaintiff and against Defendant for damages for back pay, loss of benefits and all other pecuniary damages in the amount of $300,000 or such other amount as may be established at trial;

b.     That the Court order Plaintiff's reinstatement or, in the alternative, front pay;

c.     That judgment be entered in favor of Plaintiff and against Defendant for compensatory damages in the amount of $300,000;

d.     That Plaintiff be awarded reasonable attorney's fees and all costs and expenses incurred by Plaintiff in bringing this action;

e.      Pre and post judgment interest at the highest rate permitted by law; and

Such other and further relief as the Court deems just and proper.

Respectfully submitted,

LAW OFFICE OF MARC J. SMITH, LLC

By:      ___Marc J. Smith_____
         Marc J. Smith
         Bar No. 14355
         401 North Washington Street
         Suite 500
         Rockville, Maryland 20850
         Phone: (301) 838-8950

         Counsel for Plaintiff

## TRIAL BY JURY DEMANDED

Plaintiff hereby requests trial by jury.

By:   __Marc J. Smith_____
      Marc J. Smith