# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JANET L. VALLUZZI, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 8:18-cv-03602-PX |
| ALEX M. AZAR, II, | * | |
| Defendant. | * | |
| | *** | |

## <u>MEMORANDUM OPINION</u>

Pending in this employment discrimination case is Defendant Secretary of the U.S. Department of Health and Human Services ("HHS") Alex M. Azar, II's motion to dismiss, or alternatively, for summary judgment. ECF No. 20. The motion is fully briefed, and no hearing is necessary. Loc. R. 105.6. For the reasons that follow, the Court grants Defendant's motion.

## I.    Background

The following facts are undisputed. On January 11, 2015, at age 59, Plaintiff Janet Valluzzi was hired as a GS-14 Social Scientist at HHS's National Center for Health Workforce Analysis ("NCHWA"). ECF No. 1 ¶ 8; ECF No. 20 at 6. She arrived with years of federal service under her belt. ECF No. 1 ¶ 6. George Zangaro, Ph.D. (age 55) hired Valluzzi based on the recommendation of hiring panel members Michelle Washko, Ph.D. (age 42) and Hayden Kepley, Ph.D. (age 45). ECF No. 1 ¶ 11; ECF No. 20 at 6.

Valluzzi was assigned to NCHWA's Performance Metrics and Evaluations ("PME") Branch. ECF No. 1 ¶ 13; ECF No. 20 at 6. Among other responsibilities, Valluzzi led the development of two annual program evaluation reports. ECF No. 1 ¶ 14; ECF No. 20 at 6. Development of the reports included reviewing and analyzing the existing programs, providing recommendations for improvement of the programs to HHS executives, and assisting staff in

crafting and executing improvement plans.  *See* ECF No. 27-1 at 62.

Approximately five months after Valluzzi started working for NCHWA, she began breaking out in hives on her face and body.  ECF No. 1 ¶ 17; ECF No. 27-1 at 2–33 (hereinafter "Valluzzi Dec.") ¶ 8.  This condition occurred when Valluzzi worked in the 5600 Fishers Lane building, which at the time was undergoing asbestos removal and other construction.  *Id.* Valluzzi discussed her condition with Dr. Zangaro, who advised her to report her illness to the agency's reviewing authorities.  ECF No. 29-3 at 10.  Dr. Zangaro also offered to refer her to an allergist.  *Id.* at 12.

Once the renovations were completed, Valluzzi's office was relocated to renovated space within the same building.  ECF No. 1 ¶ 18; Valluzzi Dec. ¶ 8.  Still, she continued to experience hives on parts of her body visible to others.  ECF No. 1 ¶ 21; Valluzzi Dec. ¶ 8.  Valluzzi was later diagnosed with Chronic Idiopathic Urticaria, or chronic hives.  ECF No. 20 at 20; ECF No. 1 ¶ 19; Valluzzi Dec. ¶ 10.

On November 8, 2016, NCHWA and Valluzzi formally sought a reasonable accommodation for her illness.  ECF No. 20-8 at 1–3.  A physician consultant with the building's Federal Occupational Health Clinic (FOHC), Dr. Papiya Ray, reviewed Valluzzi's medical records (including several letters from Valluzzi's doctor) and on January 25, 2017 concluded that Valluzzi suffered from an "immunological condition which intermittently affects the skin," that the "physical condition[ ], without treatment or accommodation, [ ] substantially affects one or more major body systems," and that the condition was "permanent" although variable in severity.  ECF No. 27-1 at 45–48.  Dr. Ray could not determine what triggered Valluzzi's symptoms but did note that Valluzzi's skin condition flared up at work, and thus, the workplace was the likely source of her symptoms.  *Id.* at 46.  Dr. Ray concluded that relocating Valluzzi to

another building may "reduce or eliminate her exposure" to whatever triggers her hives, but that the "only way to determine the effectiveness of the [relocation] is to try it." *Id.* "Since an exacerbating factor has not been identified," wrote Dr. Ray, "it is possible that [Valluzzi] may be able to work in a different location within 5600 Fishers Lane" and that a combination of accommodations in the workspace, including providing an air filter, may reduce the symptoms. *Id.* at 47–48.

Valluzzi wished to be moved to another building altogether. ECF No. 1 ¶ 59. Ultimately, Defendant did not agree to Valluzzi's desired accommodation. ECF No. 1 ¶ 60. ECF No. 20-8 at 16–21. Instead, by April of 2016, the parties settled on providing Valluzzi an air purifier for her office and a fixed work schedule of 7:30 a.m. to 4 p.m. *Id.* at 33, 51–57. This accommodation, according to Valluzzi, did little to alleviate her symptoms. ECF No. 1 ¶ 60; Valluzzi Dec. ¶ 63. However, after these accommodations were implemented, no evidence in the record reflects that her skin condition affected her ability to perform her essential job functions.

During Valluzzi's first year at NCHWA, Valluzzi was directly supervised by Dr. Kepley with Dr. Washko and Dr. Zangaro serving as Valluzzi's second- and third-level supervisors, respectively. ECF No. 1 ¶ 13; ECF No. 20 at 6. According to Dr. Kepley, Valluzzi completed two substantive program reports well and on-time. ECF No. 27-1 at 51 (Kepley deposition). Valluzzi's first evaluation reflects that she received an average score of 3.4 out of 5, which translated to "achieved expected results." ECF No. 27-1 at 61. Of five different "critical elements," the only element in which she received below "achieved expected results" was for the Customer Service/Teamwork element, where she was rated as having "Partially Achieved Expected Results." ECF No. 27-1 at 57. To support the low rating, the evaluation states specifically that "[o]n several occasions, Jan was unwilling to work with her evaluation

colleagues within the PME Branch. Her lack of willingness to work with others and actively participate in meetings and discussions around evaluation caused delays in final products and a less than positive tone in the Branch." ECF No. 27-1 at 62. The evaluation continues that "during the evaluation meeting on December 1, Jan had nothing to contribute to the discussion and merely took notes during the entire discussion even though she had expertise in the subject matter. On several other occasions Jan had refused to review an evaluation colleague's work which caused delays in completing the product and a negative tone in the Branch." *Id.*

On December 23, 2015, Valluzzi received a non-disciplinary Memorandum of Counseling (MOC) from Dr. Washko who was Valluzzi's temporary supervisor at the time. The MOC concerned, among other incidents, an unpleasant exchange between Valluzzi and a younger colleague, Dr. Jamie Doyle. ECF No. 1 ¶¶ 34, 35; ECF No. 20 at 6. According to Valluzzi, Dr. Doyle demanded that Valluzzi review Doyle's work while Valluzzi was out of town caring for her mother. This review was not, according to Valluzzi, within Valluzzi's job description. ECF No. 1 ¶ 26; Valluzzi Decl. ¶¶ 12–14. Dr. Doyle did not receive a similar memorandum for the incident. ECF No. 1 ¶¶ 26; 29.

In the beginning of 2016, Dr. Katherine Morasch became Valluzzi's first-line supervisor and replaced Dr. Washko as Branch Chief for four months, after which Dr. Washko reclaimed the role. *See* ECF No. 1 ¶¶ 38, 52. On January 20, 2016, Valluzzi and Dr. Washko met to discuss the MOC regarding Dr. Doyle. ECF No. 1 ¶ 36; Valluzzi Dec. ¶ 17. Valluzzi maintains that Dr. Washko reacted angrily to Valluzzi, a characterization Dr. Washko disputes. *Id.*; ECF No. 27-1 at 73. Valluzzi not only complained about Dr. Washko's behavior but also filed a grievance related to the underlying MOC. ECF No. 27-1 at 74–81; ECF No. 1 ¶ 37. Both complaints were essentially deemed unfounded by Drs. Zangaro and Washko respectively.

On February 2, 2016, Valluzzi filed a formal equal employment opportunity ("EEO") complaint, alleging "discrimination on the basis of her age, gender, disability, association with person(s) with disabilities and/or programs for persons with disabilities." ECF No. 1 ¶ 41; Valluzzi Dec. ¶ 21. Both Dr. Washko and Dr. Zangaro were aware of the complaint. ECF No. 27-1 at 87, 140. Shortly thereafter, Valluzzi and the agency settled the claim. Pursuant to a written settlement agreement executed in April 2016, Dr. Zangaro agreed to remove the MOC from Valluzzi's file after six months. ECF No. 1 ¶ 37; ECF No. 20-2 at 104–09. He also raised Valluzzi's 2015 evaluation score to "Achieved Expected Results," and noted some "improvement and collaboration" on Valluzzi's part. ECF No. 20-2 at 104–09; *id.* at 31–33. The narrative supporting Valluzzi's score for the Customer Service/Teamwork element remained the same. *Id.* at 105. The Settlement Agreement also obligated Valluzzi's supervisors to assign her work in a timely manner and support her career development endeavors. *Id.* at 104–09. Drs. Morasch or Washko never learned of the settlement terms in a timely manner or at all. ECF No. 27-1 at 142 (Dr. Washko testifying to learning of the settlement "many, many, many months later"); ECF No. 27-1 at 38–39 (Dr. Morasch testifying to having never been aware of the agreement).

In March 2016 and again in June 2016, Valluzzi formally alleged various breaches of the settlement agreement. ECF No. 1 ¶ 43; Valluzzi Dec. ¶ 24; ECF No. 27-1 at 147–54. Within this period, on May 3, 2016, Dr. Morasch issued Valluzzi a Letter of Reprimand for "failure to follow supervisor instructions" and "inappropriate conduct" arising from Valluzzi's working outside of her scheduled days and times. ECF No. 20-2 at 34–38. Specifically, Valluzzi came to work to attend a meeting on her scheduled day off, and when confronted by Dr. Zangaro about her misconduct, purportedly shut her office door in his face. *Id.* at 34. Valluzzi filed a separate

grievance related to this Letter of Reprimand, which was denied.  ECF No. 27-1 at 179–92; ECF No. 1 ¶ 50.

On August 15, 2016, Dr. Washko notified Valluzzi that because Valluzzi became a non-exempt employee covered under the National Treasury Employees Union, Valluzzi's alternative work schedule had been terminated, pursuant to the applicable collective bargaining agreement between HHS and the Union.  *See* ECF No. 20 at 9; ECF No. 20-2 at 38–40; ECF No. 1 ¶ 53. Specifically, the collective bargaining agreement barred a covered employee from participating in an alternative work schedule program if the employee had been disciplined within the last six months for a violation related to scheduling.  *See* ECF No. 20-2 at 39.  According to Dr. Washko, Valluzzi's May 2016 Letter of Reprimand rendered Valluzzi ineligible for an alternative work schedule.  *Id.*

On August 23, 2016, Dr. Washko proposed to suspend Valluzzi for five days, which Dr. Zangaro affirmed.  ECF No. 20-2 at 42–44, 50–56.  According to contemporaneous memoranda and documentary evidence, Valluzzi had been reprimanded for refusing to follow her supervisors' directives in her work assignments, speaking "about her supervisor in an inappropriate manner," using "accusatory language and [a] demeaning tone," sending disruptive emails, rudely requesting another staff member's manager to review the staff member's work, working past her tour of duty, and failing to follow instructions.  *Id.* at 50–53.  In addition to the five-day suspension, Dr. Zangaro directed Valluzzi to attend three training courses: Interpersonal Communication that Builds Trust; Being a Receptive Communication Partner; and Team and Customer Relations.  *Id.* at 54.

On November 29, 2016, Dr. Washko again proposed to suspend Valluzzi, this time for ten days.  ECF No. 20-2 at 57–62.  The detailed memorandum recites a litany of misconduct,

including failure to follow instructions, lack of candor, and refusal to follow supervisor directives. *Id.* On February 2, 2017, Dr. Zangaro affirmed the suspension. *Id.* at 64–69. In the interim, on December 16, 2016, Valluzzi filed her second formal EEO complaint.

For work year 2016, Valluzzi received an average score of 2.8 out of 5 on her performance evaluation, putting her in the category of "Partially Achieved Expected Results." ECF No. 20-2 at 94. As in 2015, Valluzzi's lowest rating was for Customer Service/Teamwork. *See id.* at 94–103. The evaluation in part reads:

> The ANE/ANEW evaluation was conducted with minimal interaction with both NCHWA and program staff. Jan also missed the report deadline, and because of the late submission, as well as her lack of building effective working relationships with other team members during the evaluation process (the Program Division as well as NCHWA management), BHW was unable to integrate the findings into the FOA redesign of the new program.

*Id.* at 101.

In late December 2016, Valluzzi submitted a draft for one of two reports she had been assigned to complete that year. ECF No. 1 ¶ 66. On January 12, 2017, Dr. Washko sent Valluzzi written comments, instructions, and edits to the report, and asked Valluzzi to amend the report accordingly. *See* ECF No. 20-3 at 9–10. Dr. Washko noted that the "report lacks structure and clear recommendations" and provided examples of how to better format the report. *Id.* at 9. Valluzzi responded to Dr. Washko in writing, outlining her concerns. *Id.* at 11–14. Valluzzi also exchanged correspondence with her new first-line supervisor, Isaac Worede, about the report. *Id.* at 15–18. Valluzzi then submitted an edited report as directed. *Id.* at 19. Dr. Mary Beth Bigley, Senior Advisor for NCHWA, noted that although this second version was generally easier to read, it still failed to communicate effectively priorities and recommendations. *Id.* Ultimately, the report was deemed unusable. ECF No. 20-7 at 12.

As for her second assigned report, an evaluation of a Nurse Faculty Loan Program, Dr.

Zangaro edited and returned it to Valluzzi with directions to rewrite and amend accordingly. ECF No. 20-4 at 4–28. Dr. Zangaro and Worede also met with Valluzzi to review the draft. *See* ECF No. 20-6 at 25–27. According to her two supervisors, Valluzzi reacted poorly to the feedback and behaved unprofessionally during the meeting. *Id.* On June 9, 2017, Dr. Zangaro provided additional edits and directed Valluzzi to resubmit a revised final report. *See* ECF No. 20-5 at 4–49. Valluzzi submitted further revisions of the report on June 20, 26, and 29, 2017. ECF No. 20-5 at 102-212. However, the final version of the report failed to implement all of the edits provided to Valluzzi and, in the end, was deemed unusable. *See* ECF No. 20-7 at 13.

On July 11, 2017, Worede initiated a formal proposal to remove Valluzzi from federal service. ECF No. 20-7 at 9–21. Worede's accompanying memorandum charged Valluzzi with (1) Failure to perform duties as instructed, supported by eight specifications; (2) Inappropriate conduct, supported by three specifications; and (3) Unacceptable performance based upon her two evaluations. *Id.* On August 17, 2017, after reviewing the proposal, Dr. Zangaro determined that removal was the appropriate remedy. ECF No. 20-7 at 22–29. He wrote that, among other reasons, Valluzzi failed to submit an acceptable work product as both of her recent reports had been rejected and deemed unusable by her supervisors. *Id.*

On September 11, 2017, Valluzzi appealed her removal with the U.S. Merit Systems Protection Board ("MSPB"). ECF No. 20-7 at 1. In the appeal, Valluzzi asserted affirmative defenses of disparate treatment based on gender, age, and disability (on her own behalf and based on her role as caregiver to a disabled person); denial of reasonable accommodation; and retaliation. *Id.* After discovery and a hearing, the MSPB sustained certain charges, denied Valluzzi's affirmative defenses, and upheld removal. *See* ECF No. 20-10. The MSPB decision became final on November 29, 2018. *See id.* at 28.

Thereafter Valluzzi filed suit in this Court, alleging gender discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Count I); hostile work environment based on gender pursuant to Title VII (Count II); retaliation for engaging in protected activity pursuant to Title VII (Count III); age discrimination pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et. seq.* ("ADEA") (Count IV); retaliation for engaging in protected activity pursuant to the ADEA (Count V); discrimination based upon disability and failure to provide a reasonable accommodation pursuant to the Rehabilitation Act of 1973 and its amendments, 29 U.S.C. § 701 et. seq. (Count VI); and retaliation for engaging in protected activity under the Rehabilitation Act (Count VII). ECF No. 1. The Court addresses the sufficiency of the claims in the following order: age discrimination claims (Counts IV and V), gender discrimination claims (Counts I, II, and III), and disability discrimination claims (Counts VI and VII).

## II.     Standard of Review

Defendant moves for dismissal or, in the alternative, for summary judgment. ECF No. 20. The parties have submitted evidence outside the four corners of the Complaint, have been given reasonable opportunity to present all pertinent material, and have both agreed that the motion should be treated as one for summary judgment. Thus, the Court reviews the motion under the summary judgment standard. *See* Fed. R. Civ. P. 12(d).[1]

---

[1]     Even though Valluzzi agrees that Defendant's motion should be treated as one for summary judgment, she also filed an affidavit pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. ECF No. 27-1 at 488. Pursuant to Rule 56(d), where the non-movant opposes resolution at the summary judgment stage, she must specify, via affidavit, the additional discovery necessary to challenge summary judgment. See Fed. R. Civ. P. 56(d). Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted). Valluzzi broadly claims to need "full and open" discovery, ECF No. 27-1 at 499, yet does not address what specific additional discovery is necessary to challenge Defendant's motion. *See Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) ("[T]he facts identified in a Rule 56 affidavit must be essential to the opposition.") (quoting *Young v. UPS*, No. DKC-08-2586,

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs., Inc*., 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co*., 381 F.2d 245, 249 (4th Cir. 1967)). Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is likewise warranted. *Celotex*, 477 U.S. at 322.

## III.  Analysis

### A.  Effect of Valluzzi's grievance and settlement

Defendant first contends that the claims before this Court cannot include events predating

---

2011 WL 665321, at *20 (D. Md. Feb. 14, 2011); *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011)) (internal quotation marks omitted). Valluzzi's professed need for additional discovery is insufficient, especially in the face of a robust administrative record in which Valluzzi's counsel took multiple lengthy depositions and exchanged voluminous paper discovery. *See Radi v. Sebelius*, 434 F. App'x 177, 179 (4th Cir. 2011).

April 4, 2016, as they are barred by the Settlement Agreement.  ECF No. 20 at 26.  Similarly,

Defendant maintains that Valluzzi may not pursue claims that she pursued through the negotiated

grievance process.  *Id.*  Valluzzi contends the such events may be considered by the Court as

"background."  ECF No. 27 at 28 n.10.

Under the plain language of the Settlement Agreement, Valluzzi agreed that all matters

arising from or related to the EEO complaint prior to the effective date of the agreement were

resolved.  *See* ECF No. 20-2 at 104.  Because none of the claims, as framed, seek to relitigate

that which was resolved in the Agreement, the Court considers pre-April 2016 conduct as

background only.  As to the actions grieved, Valluzzi has previously pursued under the terms of

the applicable collective bargaining agreement her ten-day suspension and her 2016 evaluation.

An employee covered by a collective bargaining agreement may file a grievance pursuant to her

union's negotiated grievance procedure *or* may file a formal EEO complaint, but not both.

*Moreno v. McHugh*, No. ELH-10-2511, 2011 WL 2791240, at *9 (D. Md. July 14, 2011); 29

C.F.R. § 1614.301(a) (an employee "who files a grievance with an agency whose negotiated

agreement permits the acceptance of grievances which allege discrimination may not thereafter

file a complaint on the *same matter* under [the EEO complaint procedure] irrespective of whether

the agency has informed the individual of the need to elect or of whether the grievance has raised

an issue of discrimination.") (emphasis added); *see also Wright v. Snow,* No. 02 CIV. 7615

(TPG), 2004 WL 1907687, at *5 (S.D.N.Y. Aug. 25, 2004) ("Every court that has considered the

issue has concluded that the word 'matter' in 5 U.S.C. § 7121 and 29 C.F.R. § 1614.301 refers to

the *conduct* underlying a plaintiff's claim, as opposed to the *legal allegations* in the claim.")

(emphasis in original) (collecting cases).  Thus, the Court may not consider the incidents that

were the subject of the grievance as substantive evidence supporting Valluzzi's claims before

this Court.  That said, even if the Court took such incidents into account and most favorably to

Valluzzi, for the reasons discussed below, she has failed to marshal sufficient evidence to survive

challenge.

### B.  Age Discrimination Claims (Counts IV and V)

Valluzzi contends Defendant terminated her employment because of her age, in

contravention of the ADEA.  *See* 29 U.S.C. §§ 623(a)(1), 631(a).  To sustain an ADEA claim,

"[a] plaintiff must prove by a preponderance of the evidence (which may be direct or

circumstantial), that age was the 'but-for' cause of the challenged employer decision."  *Gross v.*

*FBI Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009) (rejecting "mixed-motives" age

discrimination claims, in contrast to Title VII discrimination claims).  "An employer's reliance

on factors that are analytically distinct from age in reaching the adverse decision rules out age as

its but-for cause."  *Bennett v. Kaiser Permanente*, 931 F. Supp. 2d 697, 705 (D. Md. 2013).

For ADEA discrimination and retaliation claims based on circumstantial evidence as

here, the Court uses the same burden-shifting framework as Title VII cases, established in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Bodkin v. Town of Strasburg*, 386 F.

App'x 411, 413 (4th Cir. 2010).  To prevail under this framework, Valluzzi must first show: "(1)

[she] is a member of a protected class—that is, 40 years or older; (2) [she] suffered an adverse

employment action; (3) [she] was performing [her] job duties at a level that met [her] employer's

legitimate expectations at the time of the adverse employment action; and (4) the position

remained open or [she] was replaced by a substantially younger person."  *Id.* at 413–14 (internal

quotation marks and citation omitted).  If Valluzzi establishes a *prima facie* case, the burden

shifts to Defendant to offer a legitimate, non-discriminatory reason for its decisions.  *See*

*Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  If Defendant offers

such a reason, the burden shifts back to Valluzzi to raise a genuine dispute as to whether Defendant's proffered reason is mere pretext for discrimination. *Id.* Valluzzi, "at all times, retains the ultimate burden of persuading the trier of fact that the employer discriminated in violation of" the law. *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 841 (D. Md. 2004); *see also Moore v. Mukasey*, 305 F. App'x 111, 115 (4th Cir. 2008).

The Court begins by noting that "in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991). This "same actor inference" recognizes that "[i]t hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job." *Id.*; *see also Qiydaar v. People Encouraging People, Inc.*, No. ELH-17-1622, 2018 WL 3458310, at *10 (D. Md. July 17, 2018). The facts here give rise to such an inference because the same people that hired 59-year-old Valluzzi (Dr. Zangaro, Dr. Washko, and Dr. Kepley)[2] also initiated or confirmed her suspensions (just a year and a half after hire) and her removal (three years after hire).

Moreover, even if Valluzzi could establish a *prima facie* case of discrimination, no evidence suggests that Defendant's many reasons for its adverse actions were pretext for discrimination on account of age. *See Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (noting that plaintiff "must prove *both* that the reason [for the defendant's actions] was false, *and* that discrimination was the real reason for the challenged conduct") (emphasis in original) (quotation marks and citation omitted). With respect to the 2015 performance evaluation, Valluzzi has marshalled no evidence that she received the rating she did on account

---

[2] All three individuals involved in Valluzi's hiring were over 40 years' old. ECF No. 1 ¶ 11.

of her age.  The evaluation states explicitly that Valluzzi's "lack of willingness to work with others and actively participate in meetings and discussions around evaluation caused delays in final products and a less than positive tone in the Branch."  ECF No. 27-1 at 62.  The evaluation further details that Valluzzi failed to deliver recommendations, to use her proffered expertise, and to help a colleague (Doyle).  *Id.*  And although Valluzzi points to praise that she received from colleagues for "excellent customer service" as evidence that her evaluation was uncalled for, ECF No. 27-1 at 90–130, no evidence suggests these were related to work performed in 2015.  *Id.*  Thus, even when viewing the record most favorably to Valluzzi, no evidence suggests that the 2015 evaluation was unfounded or pretext for age discrimination.

Valluzzi points next to the 2016 Letter of Reprimand for her schedule violations as evidence of age discrimination.  ECF No. 27 at 12.  Although Valluzzi rightfully maintains, and Dr. Morasch agrees, that the reprimand was harsh, this alone does not support an age discrimination claim.  ECF 27-1 at 40.  *See Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 280 (4th Cir. 2000) ("[W]e do not sit to appraise [plaintiff's] appraisal. Rather, 'our sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory'") (citation omitted).  Similarly, both the five- and ten-day suspensions were supported with several incidents of Valluzzi's failure to follow her supervisors' instructions and of her poor communication skills.  What is more, Valluzzi's performance deficiencies were well-documented, levelled by multiple supervisors, and spanned the course of several months.  ECF No. 20-2 at 42–45, 50–56, 57–63, 64–70; ECF No. 27-1 at 204–56, 272–324.  Undoubtedly, Valluzzi disagrees with her supervisors' conclusions.  *See, e.g.,* ECF No. 27 at 15.  But mere disagreement is not a proxy for evidence of discriminatory animus.  The law remains clear: "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."

*Hawkins*, 203 F.3d at 280 (citation omitted). On this record, the Court concludes that no evidence supports an inference of pretext.

Similarly, removal was well supported. ECF No. 20-7 at 22–29. The record evidence reflects, for instance, that Valluzzi's assignments fell below acceptable standards according to multiple supervisors who reviewed the reports and provided feedback only for it to fall on deaf ears. *See* ECF No. 20-3 at 15–18 (Valluzzi contesting, in several emails, supervisors' feedback for her report); ECF No. 20-3 at 19 (Dr. Bigley noting that, even after a re-write, Valluzzi's report continued to fall below expectations); ECF No. 20-5 at 5–49 (Dr. Zangaro noting several times throughout Valluzzi's draft reports that she had failed to take his multiple edits and comments into consideration); *Compare* ECF No. 20-5 at 155 (Worede noting of Valluzzi's re-written report that there were still "several revisions that were not made based on [Dr. Zangaro's initial edits] and instructing her to "submit the necessary edits") *with id.* at 154 (Valluzzi rejecting the feedback and demanding unrelated actions from her supervisors). Indeed, two separate reports on two separate topics—which consumed approximately a year of Valluzzi's time—were deemed *unusable.* ECF No. 20-7 at 12–13. While the protracted pattern of Valluzzi's poor performance, documented from the beginning of her employment, supported her termination, no evidence exists that such termination was fueled by discriminatory animus.

Again, Valluzzi's claims of unfairness will not suffice. "When an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 299 (4th Cir. 1998) (citing *Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 410 (7th Cir.1997)).

In an attempt to generate some evidence of age discrimination, Valluzzi contends that her

colleague, Dr. Doyle, made "ageist comments" during a staff meeting, ECF No. 1 ¶ 29. Even if the Court credits that Doyle's comments, which are not described in any detail, could be construed as "ageist," Dr. Doyle had no decision-making authority over Valluzzi. Nor does any evidence suggest that Dr. Doyle's views at all affected many of the subsequent adverse employment actions at issue, which include two suspensions and her termination. Similarly, Valluzzi's impression that she was "singled out" at a work retreat in late 2015 (and in ways not altogether clear from the record) does not constitute evidence of age discrimination. ECF No. 27 at 33; ECF No. 1 ¶ 24. Nor do her vague assertions that she was subjected to "condescending comments" by Worede regarding her basic computer skills. ECF No. 27 at 33. Such isolated or ambiguous statements are too abstract to support a finding of pretext. *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 548–49 (4th Cir. 1995), *rev'd on other grounds*, 517 U.S. 308 (1996). Unfortunately for Valluzzi, "a subjective, even if genuine, belief of discrimination will not shield a nonmoving plaintiff from a grant of summary judgment." *Foreman v. Weinstein*, 485 F. Supp. 2d 608, 612 (D. Md. 2007); *see also Ash v. United Parcel Service, Inc.*, 800 F.2d 409, 411–12 (4th Cir. 1986); *accord Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) ("[Plaintiff's] unsubstantiated allegations and bald assertions concerning her own qualifications and the shortcomings of her co-workers fail to disprove [defendant's] explanation or show discrimination.").

Valluzzi's ADEA retaliation claims suffer from similar deficiencies. To establish a *prima facie* case of retaliation, Valluzzi must show 1) that she engaged in a protected activity; 2) her employer took an adverse employment action against her; and 3) there was a causal link between the protected activity and adverse action. *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998). To be sure, Valluzzi engaged in protected activity during her employment. She also

suffered adverse employment actions culminating in her removal from service. But she has

marshalled no evidence that the two are causally related or that she would not have otherwise

been terminated for legitimate non-retaliatory reasons. *See Hart v. Lew*, No. ELH-12-03482,

2015 WL 521158, at *28 (D. Md. Feb. 6, 2015), *aff'd*, 612 F. App'x 688 (4th Cir. 2015)

("[Plaintiff] must show that there is a genuine dispute of material fact as to whether she would

have been terminated in the absence of the alleged wrongful action or actions of the employer.")

(quotation marks and citation omitted)); *see also Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d

202, 210–11 (4th Cir. 2014) (refusing to base its decision on allegations of retaliation on whether

or not the termination decision was "wise, fair, or even correct."). A plaintiff's engagement in

protected activity alone cannot and does not shield an employee from discipline when warranted.

*See Guerrero v. Lynch*, 621 Fed. Appx. 755, 757 (4th Cir. 2015) (citing *Glover v. S.C. Law Enf't

Div.,* 170 F.3d 411, 414 (4th Cir. 1999)). Because no reasonable fact-finder could find that

Defendant's reasons for its employment actions were pretext for age discrimination or

retaliation, the Courts finds in favor of Defendant for summary judgment on Counts V and VI.

### C.     Gender Discrimination Claims (Counts I, II, and III)

Valluzzi contends that Defendant discriminated, retaliated, and created a hostile work

environment on account of her gender. Title VII provides that it is unlawful "for an employer

. . . to discharge any individual, or otherwise to discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Title VII also makes it an "unlawful employment practice for an employer to discriminate

against any of his employees . . . because [the employees] ha[ve] opposed any practice made an

unlawful employment practice by [Title VII], or because [the employees] ha[ve] made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." § 2000e–3(a).

For Valluzzi's sex discrimination claim to survive, Valluzzi must show that "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir. 2004) (en banc)). If Valluzzi establishes this *prima facie* case, the burden shifts to Defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. *Id.* The burden then shifts back to Valluzzi to raise a genuine issue of material fact as to whether the proffered reason is a mere pretext for discrimination. Notably, Valluzzi must generate sufficient evidence from which a reasonable factfinder may conclude that Defendant "discriminate[d] against [her] with respect to [her] compensation, terms, conditions, or privileges of employment, *because of* [her] . . . sex." 42 U.S.C. § 2000e–2(a)(1) (emphasis added); *McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015).

It is undisputed that Valluzzi is a member of a protected class and suffered adverse employment action, namely reprimand, suspension, and eventual termination. But nothing in the record supports that any such adverse action was on account of Valluzzi's gender. In maintaining otherwise, Valluzzi points only to the threadbare recitals of sex discrimination in the Complaint, which is not evidence. ECF No. 1 ¶¶ 83, 87, 91. Accordingly, no reasonable trier of fact could conclude that Valluzzi has made out a *prima facie* case of sex discrimination. Alternatively, even if Valluzzi could somehow sustain a *prima facie* case, no evidence suggests

that the otherwise legitimate reasons for each of the adverse employment actions were on account of her gender. Bare accusations of discrimination do not suffice. *See McCleary-Evans*, 780 F.3d at 585 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Rollakanti v. Holy Cross Hosp.*, No. PX 16-02914, 2017 WL 2335544, at *3 (D. Md. May 30, 2017). Thus, summary judgment on this claim is entirely appropriate.

Valluzzi's retaliation claim is similarly deficient. The standard for establishing a *prima facie* Title VII retaliation case is the same as that for an ADEA case. *Tasciyan v. Med. Numerics*, 820 F. Supp. 2d 664, 675 (D. Md. 2011). Valluzzi has generated evidence that she engaged in protected activity, and that she ultimately was removed. But, as with her ADEA retaliation claim, she has put forth no evidence that the two were causally related or that any of Defendant's reasons for its adverse employment actions are motivated by retaliation.

Likewise, Valluzzi's hostile work environment cannot proceed. To prove a hostile work environment claim, a plaintiff must show that the complained-of conduct was (1) unwelcome; (2) based on her sex; (3) sufficiently severe or pervasive to alter the conditions of employment and to create an abusive work environment; and (4) imputable to his employer. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). Even if the Court assumes that Valluzzi could prove she was subjected to sufficiently "severe" or "pervasive" conduct giving rise to a hostile work environment, she has generated no evidence that the complained-of conduct was based on her gender. Alternatively, even when viewing the litany of disagreements between Valluzzi and her supervisors most favorably to Valluzzi, the Court cannot conclude that Valluzzi could demonstrate a legally cognizable "hostile" work environment. Valluzzi certainly experienced her share of criticism for her work performance. But "[d]isagreement with the decisions or management style of one's boss" simply "do[es] not rise to the level of a hostile workplace

claim." *Brady v. Bd. of Educ. of Prince George's Cty.*, 222 F. Supp. 3d 459, 473 (D. Md. 2016), *aff'd*, 707 F. App'x 780 (4th Cir. 2018) (citing *Thorn v. Sebelius,* 766 F.Supp.2d 585, 601 (D. Md. 2011), *aff'd.* 465 Fed.Appx. 274 (4th Cir. 2012)).

As for Valluzzi's contentions that her supervisors reacted angrily to her and at times waved fingers or once threw papers, these occasional heated exchanges were no doubt unpleasant; still, it is well-settled that rudeness, anger, and hostility alone in the workplace cannot sustain a hostile work environment claim. *Cf. Vincent v. MedStar S. Md. Hosp. Ctr.*, No. TDC-16-1438, 2017 WL 3668756, at *9–10 (D. Md. Aug. 22, 2017) (no hostile work environment although supervisor yelled at employee, called her "stupid," refused to communicate with her, and harassed her almost daily); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 614 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004) (no hostile work environment although supervisor "yelled at Plaintiff, told her she was incompetent, pushed her down in her chair, and blocked the door to prevent Plaintiff from leaving while he continued to yell at her"); *see also Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir. 2003) (finding that complaints premised on nothing more than "callous behavior by superiors" are not actionable). Thus, when viewing the evidence most favorably to Valluzzi, no reasonable trier of fact could conclude that she was subjected to a hostile work environment on account of her gender.

### D. Disability Discrimination Claims (Counts VI and VII)

Valluzzi next alleges that Defendant denied her reasonable accommodations and discriminated against her because of her disability and on account of her status as caregiver for her disabled spouse and mother. The Court considers each liability theory separately.

#### 1. Failure to Accommodate

Valluzzi argues that Defendant failed to accommodate reasonably her chronic hives by

refusing to relocate her office to another building. To prevail under a Rehabilitation Act § 504 claim,[3] "a plaintiff must show that she was excluded from participation in, or denied the benefits of, a program or service offered by a public entity, or subjected to discrimination by that entity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (emphasis omitted). "Discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A) (from Title I's definition). To establish a *prima facie* case of failure-to-accommodate under the Rehabilitation Act, Valluzzi must show that (1) she qualifies as an 'individual with a disability' as defined in 29 U.S.C. § 705(20); (2) the defendant had notice of her disability; (3) she could perform the essential functions of her job with a reasonable accommodation; and (4) the defendant refused to make any reasonable accommodation. *Brady*, 222 F. Supp. 3d at 468 (quotation marks and citation omitted).

Critical to Valluzzi's claim, however, a plaintiff is not entitled to the accommodation of her choice, but simply a *reasonable* accommodation. *See Reyazuddin v. Montgomery Cty., Maryland*, 789 F.3d 407, 415–16 (4th Cir. 2015). "A reasonable accommodation is one that 'enables [a qualified] individual with a disability ... to perform the essential functions of [a] position.'" *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 580 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.2(o)(1)(ii)). To arrive at that accommodation, employers must engage in good-faith with employees through "an interactive process to identify a reasonable accommodation." *Id.* at 581 (citation omitted). In the end, the employer retains "the ultimate discretion" to select

---

[3] In general, employment discrimination claims brought under Section 504 are evaluated using the same standards as those applied under the Americans with Disabilities Act (ADA). *See Brady*, 222 F. Supp. 3d at 468; *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57 (4th Cir. 1995), *as amended* (June 9, 1995), *as amended* (Mar. 14, 2008) ("[T]o the extent possible we adjudicate ADA claims in a manner consistent with decisions interpreting the Rehabilitation Act."); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 n.9 (4th Cir. 1995).

among effective accommodations.  *Reyazuddin*, 789 F.3d 407 at 415–16 (citing *Hankins v. Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996)).

Valluzzi has undisputedly established that she is an individual with a disability and that her employer knew it.  *See* ECF No. 27-1 at 46; ECF No. 20-8.  The parties vigorously dispute, however, whether Valluzzi was provided a reasonable accommodation such that she could perform the essential functions of her job.  Valluzzi's requested accommodation for her disability was to relocate her office outside of the 5600 Fishers Lane Building.  ECF No. 1 ¶ 59.  Defendant offered instead to relocate Valluzzi to a different floor in the building and provide an air purifier.  ECF No. 20-8 at 16–18.[4]  Valluzzi rejected this accommodation, but in the end, after negotiation, the parties settled on the air purifier and a change in her work schedule.  ECF No. 20-8 at 33, 51–57.  Thereafter, Valluzzi made no other requests for other accommodation.

On this record, Valluzzi cannot show that either the offered or agreed-upon accommodation were unreasonable.  Nor does the record support that Valluzzi's performance deficiencies were linked to her hives, or that failure to move her out of the Fishers Lane building led to her inability to do her job.  Indeed, when viewing the evidence most favorably to Valluzzi, her claim at best amounts to a disagreement over whether she should have received the accommodation of her choice.  Summary judgment therefore is granted in Defendant's favor as to this claim.

### 2. Discrimination under the Rehabilitation Act

Valluzzi next contends that she suffered from discrimination based on her own disability (chronic hives) and based on her association with persons known to suffer from a disability.  ECF No. 1 ¶ 113.  To establish a *prima facie* claim under section 504 of the Rehabilitation

---

[4] According to the FOHC physician, both Valluzzi's and Defendant's proposed accommodations had the potential to work.  ECF No. 27-1 at 45–46.

Act, the plaintiff must show (1) she is an individual with a disability as defined by the

Rehabilitation Act; (2) she is otherwise qualified; (3) she is being excluded from the participation

in, being denied benefits of, or being subjected to discrimination under the program solely by

reason of her disability; and (4) the relevant program or activity receives federal financial

assistance. *Armstead v. Becton Dickinson Primary Care Diagnostics, Inc.*, 919 F. Supp. 188,

192 (D. Md. 1996). If the plaintiff establishes a *prima facie* case, the burden shifts to defendant

to provide a legitimate, nondiscriminatory reason for its conduct. *See Perry v. Computer Scis.*

*Corp.*, 429 F. App'x 218, 219–20 (4th Cir. 2011) (applying *McDonnell Douglas* framework to

Rehabilitation Act claim). If the plaintiff provides such a reason, the defendant "bears the

ultimate burden of persuasion" and "must show by a preponderance of the evidence that the

proffered reason was a pretext for discrimination." *Id.* at 220.

Of her first theory of liability—that she was discriminated against because of her hives—

Valluzzi puts forth absolutely no evidence. At most, Valluzzi states that during a work meeting,

Dr. Morasch "mocked" her after she attempted to obtain clarification about an announcement

regarding the disclosing of health conditions to supervisors. ECF No. 1 ¶ 54. Valluzzi provides

no detail, and no other evidence concerning this supposed "mockery." Nor can the Court find

any such evidence after careful review of the voluminous record. *See Hayes v. North State Law*

*Enforcement Officers Ass'n,* 10 F.3d 207, 215 (4th Cir. 1993), *cert. denied sub nom. Price v. City*

*of Charlotte,* 520 U.S. 1116 (1997) (noting that the burden rests on both parties to file the

necessary materials with the court to support their claims for and against summary judgment).

Additionally, the Court notes that even if Valluzzi felt "mocked," no evidence connects this

interaction with an adverse employment action or a denial of benefits. As such, a reasonable

trier of fact could not find that she satisfies prong three of a *prima facie* case of disability

discrimination, or even if the *prima facie* claim were made, that any of the adverse actions that befell Valluzzi were pretextual.

Of her second theory of liability—that she was discriminated against because of her relationship with her disabled spouse and mother—the Court is guided by Title I of the ADA, which governs associational discrimination in employment. *See* 42 U.S.C. § 12112(b)(4). This provision "was intended to protect qualified individuals from adverse job actions based on 'unfounded stereotypes and assumptions' arising from the employees' relationships with particular disabled persons." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002) (*citing Oliveras–Sifre v. Puerto Rico Dept. of Health*, 214 F.3d 23, 26 (1st Cir. 2000)). Accordingly, Valluzzi must marshal some evidence that she maintained a relationship with an individual with a disability and suffered discrimination solely by reason of that association. *Armstead*, 919 F. Supp. at 192.

The parties do not dispute that Valluzzi was a caregiver to her disabled spouse, who had multiple sclerosis, and her mother, who had a cognitive disability. ECF No. 1 ¶ 15. Also uncontested is that Defendant knew of Valluzzi's caregiving responsibilities. ECF No. 1 ¶ 16. However, in the same vein as all her previous claims, this claim suffers from a failure of proof as to any causal connection between her role as caregiver and the adverse employment actions. In response, Valluzzi maintains Dr. Zangaro discussed with another division director who said Valluzzi was "difficult to work with" and that she preferred working with Dr. Doyle. ECF No. 1 ¶ 30. Even if true, this information does not support that Valluzzi was treated adversely because of her role as a caregiver. Likewise, Valluzzi's bare allegation that she was "repeatedly pressured to telework despite her ineligibility due to status as caregiver to a person with a disability" is unsupported. ECF No. 1 ¶ 70(r). The Court cannot find evidence of such pressure,

or how such pressure led to any of the adverse actions against Valluzzi.  Instead, the record

supports that telework was an available option for employee-caregivers who could arrange for

alternative caregiving arrangements during the hours spent teleworking.  ECF No. 27-1 at 43;

ECF No. 29-1 at 7.  Thus, any discussion of possible telework would cut in favor of

accommodating Valluzzi as a caregiver, not against it.

Valluzzi also contends that Dr. Doyle "verbally harassed, bullied and discriminated

against Plaintiff" by asking Valluzzi to review Doyle's report while Valluzzi was on approved

leave to care for her mother and that, in any event, such review was beyond her job

responsibilities.  ECF No. 1 ¶¶ 26, 27.  Even construed most favorably to Valluzzi, this incident

involving Doyle, a colleague with no supervisory authority over her, does not prove that the

well-documented series of incidents related to Valluzzi's poor interpersonal skills and inability to

produce a *usable work product* had anything to do with Valluzzi's status as a caregiver.[5]

Similarly, her disability retaliation claim, Count VII, fails because again, no evidence

demonstrates that the well-documented reasons for her poor evaluations, suspensions, or removal

were pretextual or otherwise motivated by discriminatory animus or retaliation.  *See Lewis v.*

*City of Virginia Beach*, No. 2:15CV321, 2016 WL 4766515, at *12 (E.D. Va. Sept. 12, 2016)

("[O]ther than voicing her general disagreement with Defendant's stated reasons for its actions,

---

[5] Valluzzi additionally recites a litany of instances in which she characterizes the behavior of her supervisors and
coworkers as disparaging, hostile or offensive.  *See* ECF No. 1 ¶ 24 (Valluzzi noting that she was "singled out and
subjected to disparaging comments" at a work retreat); ECF No. 27 at 15 (Valluzzi arguing that her rude email tone
merely captures her offense at her supervisors' actions); ECF No. 1 ¶¶ 46–47 (Valluzzi reporting incident where Dr.
Zangaro became angry that Valluzzi was present in the office on a day for which she was not scheduled); *id.* ¶ 73
(Valluzzi stating that she was taunted by security when she was taking her belongings out of the office); *id.* ¶ 76
(Valluzzi noting that she considered picking up her belongings at the loading dock demeaning).  Valluzzi provides
no record evidence that supports such characterizations.  Her "own subjective belief" that she was mistreated
because of her age, gender, disability, or association with disabled persons, "no matter how heartfelt," simply is
insufficient to survive summary judgment.  *Bowen v. Darby Dev. Co., Inc.*, No. CIV.A. 2:10-2509-RMG, 2012 WL
2675323, at *10 (D.S.C. Apr. 26, 2012), *report and recommendation adopted,* No. 2:10-CV-2509-RMG, 2012 WL
2675470 (D.S.C. July 6, 2012).

Plaintiff has not submitted evidence that places the validity of Defendant's reasons in doubt.").

The Court grants summary judgment in Defendant's favor on Valluzzi's disability-related

claims.

**IV.     Conclusion**

In sum, Valluzzi has generated no evidence that the adverse employment action she

suffered was due to anything other than her own persistent poor job performance.

Throughout her employment, and in this case, Valluzzi was ill-served by her own strategy of

asserting every conceivable liability theory without regard to whether any of the claims were

supported with evidence.  Without such evidence, the Court must grant Defendant's motion for

summary judgment.  A separate order follows.


_____1/10/2020_____                    _____/S/_____
Date                                                Paula Xinis
                                                    United States District Judge